OPINION
{¶ 1} Jacquana Nelson ("Nelson") appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of her daughter, Trinity Nelson ("Trinity"), to Montgomery County Children Services ("MCCS").
 {¶ 2} The record reveals the following facts. Trinity Nelson was born on November 1, 2000, to Jacquana Nelson, who was 14 years old at the time of her birth. Nelson and Trinity resided with Nelson's maternal great-aunt, Mary Clark ("Clark"). Devon Winns, the alleged father of Trinity, has not been a part of Trinity's life, and his paternity has not been established.
 {¶ 3} On July 26, 2001, Trinity was removed from her home after a scalding incident. At that time, MCCS created a case plan for Nelson and Clark (tr 18-19). The plan required Nelson to undergo a parenting and psychological assessment, to follow the recommendations of that assessment, to attend school regularly, to attend visitation with Trinity, and to receive individual counseling to address separation from her daughter. Clark was required to encourage Nelson and to help assure that she attended all appointments. Nelson and Clark were further required to provide the names and addresses of other family members with whom Trinity could possibly be placed. MCCS reviewed the terms of the plan with Nelson and Clark at that time (July 2001) and again in November 2001. Pursuant to the case plan, Nelson underwent psychological assessments with Dr. Mike Pignatiello in December 2001 and January 2002. Based on the assessment, Nelson was also required to receive parenting classes and individual counseling.
 {¶ 4} On January 20, 2002, Montgomery County Children Services filed a complaint in the trial court, alleging that Trinity had been abused, neglected, and was dependent. The agency alleged that Trinity had been abused and neglected, because she suffered second-degree burns after her mother ran hot water on her in the sink and left her unattended. MCCS indicated that a skeletal survey had subsequently found a fracture of Trinity's femur. The agency further indicated that prior to the scalding incident it had received several referrals in regard to the mother not properly dressing Trinity, taking her to daycare with a urine soaked diaper and feeding her spoiled milk. On February 28, 2002, the magistrate awarded temporary custody of Trinity to MCCS. The court further ordered that Nelson receive visitation with Trinity, and it incorporated the case plan into its decision.
 {¶ 5} On June 6, 2002, MCCS sought permanent custody of Trinity Nelson. A hearing on the motion was held on October 29, 2002. On January 2, 2003, the magistrate issued a report and recommendation, granting MCCS's motion for permanent custody of Trinity. The magistrate concluded that Nelson lacked the maturity necessary to parent Trinity. She found that Nelson had not attended school regularly and had not taken the necessary parenting classes, and that she had failed to show initiative to work toward reunification. The magistrate concluded that neither Clark nor Krystal Moon ("Moon"), another relative, were suitable to care for Trinity. She further concluded that the alleged father had taken no action to be part of Trinity's life. Thus, the magistrate ruled that granting permanent custody of Trinity to MCCS was in Trinity's best interest.
 {¶ 6} Nelson filed objections to the magistrate's decision. She argued that the agency had not made reasonable efforts to prevent divestiture of her parental rights. Nelson further asserted that there were family members who were suitable to raise Trinity and who were willing and able to accept legal custody of her. Nelson objected to the dispositional findings, which found that granting permanent custody to MCCS was in Trinity's best interest. On June 10, 2003, the trial court overruled those objections and adopted the magistrate's decision in its entirety. This appeal followed.
 {¶ 7} Nelson raises seven assignments of error on appeal. To facilitate our analysis, we will first address Nelson's second assignment of error and then turn to her remaining assignments of error, addressing them together.
 {¶ 8} "II — The trial court erred in finding that the agency has made reasonable efforts (1) to prevent the removal of trinity from her home; (2) to eliminate the continued removal of trinity from her home; and (3) to make it possible for trinity to return home. (finding of fact #3)"
 {¶ 9} In her second assignment of error, Nelson asserts that MCCS did not make reasonable efforts to assist her in satisfying the requirements of her case plan and to make it possible for Trinity to return home. She indicates that she requested increased visitation with Trinity but her request was denied by MCCS. She further argues that MCCS had some responsibility to assist her in attaining the reunification objective, and that the agency failed to satisfy this obligation in that it did not assist her in enrolling in parenting classes and did not adequately monitor the progress of her counseling or attendance at school.
 {¶ 10} Prior to an award of permanent custody to a public children services agency, the trial court must determine whether the agency has made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1). "Reasonable efforts are described as being a good faith effort which is `an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.'" In reCranford (July 24, 1998), Montgomery App. Nos. 17085 and 17105, citing Inre Weaver (1992), 79 Ohio App.3d 59, 606 N.E.2d 1011. "The issue is not whether CSB could have done more, but whether it did enough to satisfy the `reasonableness' standard under the statute." In re Smith (Apr. 12, 2002), Miami App. No. 2001-CA-54. The agency bears the burden of establishing that it made reasonable efforts or that such efforts would be futile. In re Secrest, Montgomery App. No. 19377, 2002-Ohio-7096. When a trial court makes a determination under this statute, it is required to make written findings of fact detailing the relevant services provided by MCCS to the family and why those services did not enable the child to return home safely. R.C. 2151.419(B)(1).
 {¶ 11} The trial court concluded that MCCS had made reasonable efforts to reunify Trinity and Nelson, as required by R.C. 2151.419, by providing information and contacts for counseling, parenting classes, and for the parenting and psychological evaluation. The court noted that MCCBS discussed the case plan with Nelson on several occasions and that she had claimed that she understood it. The court concluded that MCCS could not be faulted for Nelson's failure to attend school, parenting classes or counseling. We agree.
 {¶ 12} Nelson's case plan required her to undergo a parenting and psychological assessment and to follow any recommendations from that assessment, to attend school regularly, to attend visitation with Trinity, and to receive individual counseling. In September of 2001, MCCS referred Nelson to Dr. Pignatiello to obtain the parenting and psychological assessment. Dr. Pignatiello testified that the assessments were performed in December 2001 and January 2002, and that Nelson had missed some appointments prior to those dates. Jennifer Davey ("Davey"), Nelson's caseworker, testified that when the results of the assessment came in, she encouraged the family to meet with Dr. Pignatiello to have him review the full assessment with them. Based on the evidence, we conclude that MCCS took appropriate steps to assist Nelson in satisfying the assessment requirement.
 {¶ 13} As for the counseling requirement in the case plan, Davey testified that she had been informed that Nelson was already enrolled in counseling and therefore she did not need to make any referrals for counseling. Specifically, Davey was told that Nelson and Clark were looking into Willow Counseling Center and Adolescent Wellness Center for counseling services. Nelson indicated in January 2002 that she was attending Willow Counseling Center. In August 2002, she informed Davey that she was attending Advanced Therapeutic Services. Although there is no evidence that MCCS provided any counseling referrals to Nelson, the evidence supports the agency's position that no referrals were necessary.
 {¶ 14} Nelson asserts that MCCS failed to closely monitor her counseling progress, and she faults MCCS for not obtaining reports or documentation from Advanced Therapeutic Services regarding her progress. We reject Nelson's assertion that MCCS should have taken a more proactive role in monitoring her progress and attendance. As stated by the trial court, "the Agency's purpose is to act as a guide and it was not established to force the mother to complete the case plan."
 {¶ 15} After the psychological assessment was performed, Nelson was required to attend parenting classes. Davey testified that when she discussed classes with her, Nelson indicated that she was going to take parenting classes at Colonel White High School. Later, when Davey discovered that Nelson was not attending parenting classes at school, Davey asked why she had not told her so she could make a referral. In September 2002, Davey sent Nelson a list of places where she could get parenting classes. In addition, on September 4, 2002, Davey sent Nelson a letter informing her about the Tools for Tots program, which consisted of a free set of classes geared to the age of her child. Based on this evidence, we conclude that MCCS took reasonable steps to assist Nelson in obtaining parenting classes.
 {¶ 16} Nelson asserts that she attempted to enroll in parenting classes at her high school but that she did not receive a modified schedule from her school counselor, Mr. Calloway, or the assistant principal with whom she spoke, Mattie Hudson. Even assuming that Hudson and Calloway should have provided more assistance, any alleged deficiencies in the actions of school personnel cannot be attributed to MCCS. In addition, Nelson had several opportunities subsequent to the spring 2002 school term to pursue parenting courses, yet she failed to do so.
 {¶ 17} Nelson asserts that MCCS failed to make reasonable efforts to unite her with Trinity when it refused to increase her visitation with Trinity. She notes that the MCCS caseworker observed positive interactions between Nelson and Trinity during her weekly visits, and that Dr. Pignatiello testified that increased visitation could have been beneficial to Nelson and Trinity. Although the record supports Nelson's assertion that she consistently visited with Trinity and that those visits were generally positive, we cannot conclude that the agency's failure to increase Nelson's visitation with her child had any impact on MCCS's overall efforts to reunite Trinity and Nelson. Although increased visitation would likely have strengthened the bond between Nelson and her child, that bond would not have mitigated Nelson's failures to attend school regularly, to attend parenting classes and to receive regular counseling.
 {¶ 18} Nelson makes much of the fact that the case plan was not adopted by the trial court until February 28, 2002, and that MCCS filed its motion for permanent custody in June of 2002. She further contends that she had demonstrated improvement in parenting skills even before taking the required classes and that she should be given the opportunity to complete parenting classes. However, the undisputed testimony indicates that Nelson's case plan was developed in July of 2001, and that only the parenting class requirement was added after the psychological assessment. As of the time of the hearing, Nelson had failed to satisfy the school attendance and the parenting class requirements of her case plan. Although Nelson indicates that she repeatedly attended counseling sessions at Advanced Therapeutic Services, Karen Bradley, her therapist, testified that she attended only in June 2002. We emphasize that Nelson testified that she twice reviewed the case plan with her caseworker and that she understood what was required of her. We further emphasize that Clark was specifically included in the plan with the obligation that she ensure that Nelson attended school and any necessary appointments. Upon review of the record, we conclude that MCCS took reasonable steps to reunite Trinity and Nelson, as required by R.C. 2151.419.
 {¶ 19} Nelson's second assignment of error is overruled.
 {¶ 20} "I — The trial court erred in overruling mother, Jacquana Nelson's objections to the Magistrate's decision as there was not clear and convincing evidence to support the trial court's decision to award permanent custody of the Child to mccs."
 {¶ 21} "III — The trial court erred in finding that Jacquana has failed to respond to services rendered by csb because she is unable to demonstrate parenting skills. (finding of fact #7)."
 {¶ 22} "IV — The trial court erred in finding there are no relatives or non-relatives suitable to care for trinity (finding of fact #8)."
 {¶ 23} "V — The trial court erred in finding that there are no relatives or non-relatives willing and able to accept legal custody of the child. (finding of fact #18)."
 {¶ 24} "VI — The trial court erred in adopting the magistrate's dispositional findings."
 {¶ 25} "VII — The trial court erred in adopting the magistrate's decision that permanent custody should be granted to montgomery county children services."
 {¶ 26} In her first, third, fourth, fifth, sixth, and seventh assignments of error, Nelson challenges the trial court's adoption of the magistrate's determinations that MCCS should be granted permanent custody of Trinity, and that neither Nelson, Clark nor Moon were suitable legal custodians. Specifically, Nelson asserts that the trial court should have found that Mary Clark or Krystal Moon were suitable relatives to care for Trinity and that they were willing and able to do so. Nelson also challenges the trial court's adoption of various dispositional findings by the magistrate regarding Clark and Moon: (1) that Trinity was abused while under Clark's supervision; (2) that Clark had minimal visitation with Trinity and had not established a bond with her; (3) that Clark could have visited with Trinity while the mother visited but chose not to do so; and (4) that Moon "never even met the child." Nelson also argues that the trial court erred in adopting the dispositional findings that she had shown no initiative to work toward reunification, and she claims that she is able to demonstrate the necessary parenting skills to raise her child. Finally, she argues that the trial court erred in granting permanent custody of Trinity to MCCS. Because of the interrelatedness of these assignments of error, they will be addressed together.
 {¶ 27} R.C. 2151.414(B)(1) sets forth the circumstances under which a court may grant permanent custody of a child. It provides that permanent custody may be granted if it is in the child's best interest and either:
 {¶ 28} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 29} "(b) The child is abandoned.
 {¶ 30} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 31} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 32} Id. Under R.C. 2151.414(B)(1)(d), when a child has been in the custody of MCCS for twelve or more months of a consecutive twenty-two month period, the trial court may award permanent custody to the agency without determining whether the child can be placed with a parent within a reasonable period of time. In re McKinley, Montgomery App. No. 19716, 2003-Ohio-2828. The trial court's decision to award permanent custody to MCCS must be supported by clear and convincing evidence establishing the statutory requirements of R.C. 2151.414(B)(1). In re Watts, Montgomery App. No. 19034, 2002-Ohio-2272.
 {¶ 33} R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.
 {¶ 34} In the present case, the trial court found that granting MCCS permanent custody of Trinity was in the child's best interest, that she had been in temporary custody for at least twelve out of the last twenty-two months, and that placement of Trinity with Nelson or her alleged father was not feasible within a reasonable period of time. The trial court has provided reasoning for ruling in the agency's favor under both R.C. 2151.414(B)(1)(a) and (B)(1)(d). Although Nelson has not phrased her assignments of error in terms of the statutory scheme, the assignments of error primarily relate to whether granting MCCS permanent custody of Trinity was in the child's best interest.
 {¶ 35} Beginning with the mother, Nelson asserts that the trial court erred in adopting the dispositional finding that she had shown no initiative to work toward reunification, and she claims that she is able to demonstrate the necessary parenting skills to raise her child. We disagree. Dr. Pignatiello testified that based on the evaluation that he performed, the issues from the clinical interview and the test results, he did not believe that Nelson could independently parent her child. At the custody hearing, the court was presented with substantial evidence that Nelson was given ample opportunity to complete her case plan yet she failed to do so. Although Nelson satisfied those portions of her case plan which required a psychological evaluation and consistent visitation with Trinity, she did not attend parenting classes, with the exception of a single class held at Miami Valley Hospital. In addition, Nelson failed to satisfy the case plan requirement that she attend school regularly. The assistant principal of Colonel White High School, Mattie Hudson, testified that she had regularly dealt with Nelson regarding disciplinary issues, such as leaving school without permission, nonattendance of class, use of profanity, disrespect to administrators, and disrespect to staff. Hudson further testified that she had not noticed any improvement in Nelson's behavior in the last year. Although Nelson testified that she had attended three counseling sessions with Karen Bradley at Advanced Therapeutic Services, Bradley testified that she only attended the June 2002 session. The court had the discretion to credit Bradley's testimony over Nelson's. See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80. Accordingly, the trial court had substantial credible evidence that Nelson lacked the necessary parenting skills, that she had not satisfied numerous requirements of her case plan, and thus she had not made a reasonable effort to obtain the necessary skills to parent her child. The trial court did not err in concluding that Trinity could not be placed with Nelson within a reasonable time.
 {¶ 36} Turning to whether Clark was a suitable legal custodian for Trinity, Nelson argues that the record demonstrates that Clark had raised two children, she had held a foster care license for nine years at the time of the hearing and she had taken about 25 foster children into her care. Clark's home had never been deemed inadequate. Clark testified that she would have sought legal custody of Trinity earlier had she known that she was eligible to pursue it. Nelson testified that she would prefer Clark to have legal custody of Trinity.
 {¶ 37} The trial court had numerous concerns with Clark as a legal custodian for Trinity. It noted that Clark usually did not visit with Trinity more than fifteen minutes per week, even though she had been permitted two hours of visitation. Although the trial court recognized that Clark claimed that she had not visited more because she was working two jobs, the court noted that Clark had quit one of those jobs over seven months before the hearing yet she still did not increase her visitation. The trial court found that this behavior proved the lack of a sincere interest and commitment to raising Trinity. The trial court further found that Clark had not met her case plan goals, as demonstrated by the facts that Nelson had not attended parenting classes and that she had issues with truancy at school. The court further considered relevant the fact that Trinity was in Clark's care when she was burned. Thus, the court found that Clark was not a suitable placement for Trinity.
 {¶ 38} We find no fault with the trial court's conclusion regarding Clark. The trial court gave due weight to the limited amount of time that Clark had spent with Trinity during visitation, particularly since Clark was entitled to spend the entire two hours with the child. In addition, the trial court properly considered the fact that Clark did not increase the amount of time spent with Trinity after she quit her second job. Although Trinity lived in Clark's home until her removal in July of 2001, in light of the limited visitation between Trinity and Clark over the subsequent thirteen months, the court could have reasonably concluded that the bond would have substantially diminished. Moreover, the court reasonably considered the fact that Trinity was burned while residing in Clark's home and that MCCS had talked with Clark about supervising Nelson with her child prior to the scalding incident. (We note that in granting temporary custody to MCCS, the magistrate had concluded that Trinity had been abused.) The court further had evidence that Clark had failed to ensure that Nelson met her goals under the case plan, as the plan required Clark to do. We conclude that the trial court had competent and credible evidence that placing Trinity with Clark was not in the child's best interest, and the trial court did not err in adopting the dispositional findings regarding Clark.
 {¶ 39} As for Krystal Moon, MCCS was first made aware of her possible interest as a legal guardian for Trinity in September 2002. Davey testified that she initiated a home study on September 16, 2002, and that Moon was very cooperative with the paperwork at that time. However, in early October 2002, Moon informed her that she would be unable to take Trinity. On October 21, 2002, Davey again spoke with Moon, who repeated that she was unable to take legal custody of Trinity, because she might have to care for her granddaughter. Davey further testified that she had concerns about Moon receiving custody of Trinity, because Moon had seen Trinity only once when she was in the hospital and Moon had no relationship with her. Davey also was unable to verify that Moon had appropriate income or housing to care for Trinity. Although Moon is a licensed daycare provider and has raised four children of her own, the trial court did not err in concluding that Moon was not a suitable legal guardian for Trinity. Although the magistrate was incorrect in stating that Moon had "never even met the child," the evidence indicates that she had minimal contact with Trinity and no contact since Trinity was an infant. Thus, the magistrate's misstatement was inconsequential.
 {¶ 40} Nelson claims that the trial court erred in granting MCCS permanent custody of Trinity. The trial court had evidence that Trinity had been with the same foster parents for well over a year, and that they had bonded. The foster parents made a statement at the custody hearing, indicating that Trinity had blossomed since entering their care and that they wished to adopt her. The guardian ad litem for Trinity recommended to the court that permanent custody be granted to MCCS. The court also had evidence that Nelson had not satisfied numerous requirements of her case plan and that Trinity could not be reunited with her within a reasonable time. Morever, Trinity had not had any significant contact with either Moon or Clark during the past year. Accordingly, applying the factors set forth in R.C. 2151.414(D), the trial court did not err in finding that granting MCCS permanent custody of Trinity was in Trinity's best interest.
 {¶ 41} The first, third, fourth, fifth, sixth and seventh assignments of error are overruled.
 {¶ 42} The judgment of the trial court will be affirmed.
Brogan, J., and Grady, J., concur.